# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br><br>        v.<br><br>Vicente Castro-Taveras,<br><br>    Defendant. | Crim. No. 02-266 (SEC) |

## OPINION & ORDER

Before the Court is Petitioner Vicente Castro-Taveras' writ of *coram nobis* on remand from the First Circuit. For the reasons that follow, the writ is granted, and Petitioner's conviction is vacated.

### I.    Background

Petitioner is a native of the Dominican Republic and a permanent resident of the United States since 1995. During those years, he worked in a vehicle repair shop in Vega Baja, Puerto Rico. In 2002, the FBI swept up Petitioner and seventeen other co-conspirators in an insurance fraud probe. Petitioner pled guilty, and this Court sentenced him to a term of three years of probation, a $1,000 fine, and a special monetary assessment of $400. See ECF No. 362.

Nearly a decade later, Castro sought legal advice regarding his immigration status. His attorney told him that, since he had pled guilty to an aggravated felony (as the fraud involved losses in excess of $10,000), he was considered a deportable alien under the immigration laws of the United States. See 8 U.S.C. § 1227. His residence permit expired on June 27, 2013. Docket # 627.

Following the advice of his immigration counsel, Petitioner sought relief through a writ of *coram nobis*. There, he argued that he had received erroneous legal advice regarding the collateral immigration consequences of his guilty plea from his defense counsel during those proceedings. This advice, argued Petitioner, violated his Sixth Amendment right to effective assistance of counsel. Petitioner further alleged that during the plea negotiations, the prosecution had also mentioned that the plea would not affect his immigration status.

Throughout these proceedings, counsel has steadfastly corroborated Petitioner's account by affirming that, to the best of his knowledge, "the negotiation and representation to Mr. Castro as his counsel was that a sentence of probation granted if he cooperated would not affect his status as resident of the United States." Docket # 627, p. 2. In order to cure the unexpected consequences of his plea, Petitioner asked the Court to vacate this judgment and enter a new judgment "to reflect an amount less than $10,000" or, in the alternative, grant a new trial. Id.

In his writ, Petitioner argued that Padilla v. Kentucky, 559 U.S. 356 (2010), entitled him to relief. In that case, the Supreme Court held that a noncitizen defendant is entitled to the "effective assistance of competent counsel" before entering a plea of guilty, which includes advice concerning the deportation consequences of such a plea. Padilla, 559 U.S. at 364-65. Also, in finding no "relevant difference 'between an act of commission and an act of omission' in this context[,]" Padilla squarely held that both erroneous legal advice regarding the immigration consequences of a guilty plea, as well as an attorney's failure to provide any advice on that matter, may violate the Sixth Amendment's guarantee of effective legal assistance.[1]

The problem was that the Supreme Court issued Padilla almost a decade after Petitioner's judgment had solidified. And under the principles set out in Teague v. Lane, 489 U.S. 288 (1989), a criminal defendant cannot benefit from a "new rule" of

---

[1] This does not mean that a defendant is automatically entitled to relief. For that, the defendant must also show prejudice, as required by Strickland v. Washington, 466 U.S. 668 (1984).

constitutional law set forth in Supreme Court precedent in a collateral challenge to a final conviction. This is termed the "retroactivity doctrine." Under Teague, "a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." 489 U.S. at 301.

The question, then, was whether Padilla announced a new rule of constitutional law concerning deportation advice to noncitizens. In 2013, the Supreme Court appeared to answer that question in the affirmative. See Chaidez v. United States, 133 S.Ct. 1103 (2013). Under Chaidez, this Court held that Petitioner's challenge was doomed. The Court denied his writ, and Petitioner appealed.

In an expansive opinion, the First Circuit charted the rugged legal landscape left in the wake of Chaidez and held that, for purposes of the retroactivity doctrine, there is a difference between an attorney's erroneous advice regarding the deportation consequences of a guilty plea, and the attorney's failure to advise his client of those consequences. United States v. Castro-Taveras, 841 F.3d 34 (1st Cir. 2016). The First Circuit held that Padilla announced a new rule of constitutional law regarding claims that the attorney had failed to advise a client of such collateral effects of a guilty plea. Id. ("[I]t is an uncontroversial statement of the law to say that Padilla announced a new rule, at a minimum, as to non-advice claims."). But the question that vexed the court, and the one at the core of the *coram nobis* in this case, was whether the "new rule extend[ed] to affirmative misrepresentation claims," at least prior to the date when Petitioner's judgment became final. Id. at 42. Finding no clear answer in the Supreme Court's decisions, the First Circuit turned to the lower courts. At that level, in contrast, there was virtually unanimous consensus: Padilla did not announce a "new rule" regarding affirmative misstatement claims; instead, the rule merely hid in plain sight, quietly "awaiting an instance in which it would be pronounced." Id. at 48 (citing Kovacs v. United States, 744 F.3d 44, 50 (2d Cir. 2014)). After canvassing federal and state court decisions, the First Circuit found that the "the underlying principle for Padilla's misadvice holding—that an attorney's misrepresentation, even on a collateral matter,

may constitute ineffective assistance—was so embedded in the fabric of the Sixth Amendment framework […] that all reasonable jurists would have agreed that Strickland applied to misadvice claims on deportation consequences." Id. at 51 (internal citations and punctuation omitted).

What all of this means, of course, is that the Court painted with too broad a brush in denying Petitioner's writ of *coram nobis*. The core of Petitioner's writ – that his plea of guilty is marred by erroneous legal advice such that it violated his right under the Sixth Amendment to effective legal assistance – is not barred by the doctrine of retroactivity. Before testing the merits of this claim, however, it is worthwhile to revisit the standard of review applicable to the writ.

## II.     Standard of Review

In federal criminal cases, the writ of coram nobis is "available as a remedy of last resort for the correction of fundamental errors of fact or law." United States v. George, 676 F.3d 249, 253 (1st Cir. 2012) (citing Trenkler v. United States, 536 F.3d 85, 93 (1st Cir. 2008)). The writ "'provides a way to collaterally attack a criminal conviction' for an individual who is out of custody 'and therefore cannot seek habeas relief' under 28 U.S.C. § 2255 or § 2241." In re Ifenatuora, 528 Fed. Appx. 333, 335 (4th Cir. 2013) (quoting Chaidez, 133 S.Ct. at 1106 n.1).

For Petitioner to open the door to *coram nobis* relief, he must first (1) explain his failure to seek earlier relief from judgment; (2) show that he continues to suffer significant collateral consequences from the judgment; and (3) demonstrate that the judgment resulted from an error of the most fundamental character. George, 676 F.3d at 255. Id. Even if these prerequisites are met, the Court retains discretion to deny the writ if Petitioner fails to show that "justice demands the extraordinary balm of coram nobis relief." Castro-Taveras, 841 F.3d at 39.

## III.    Discussion

The first two elements are easy to dispatch, since the Government has already conceded them. See ECF No. 651. There is no doubt that Petitioner adequately explained

his failure to seek earlier relief, as the issue only arose when he sought immigration advice in 2011, and he quickly filed his writ thereafter. Likewise, there is no question that he could still suffer significant prejudice from his plea, as he has been automatically deportable since the judgment became final. See Williams v. United States, 858 F.3d 708, 715 (2017) (finding that a noncitizen's deportable status arising from a criminal judgment satisfies the collateral consequence element of the test). As the First Circuit recognized on appeal, the dispute in this case centers on the third prong of this test: that the criminal conviction is tainted with an error of the most "fundamental character."

In Williams, the First Circuit acknowledged that erroneous legal advice given prior to a plea deal is a fundamental error sufficient to warrant *coram nobis* relief, provided it falls short of the Strickland standard for effective assistance of counsel. Williams, 858 F.3d at 716. Hence, Petitioner's claim must be tested against that standard, which requires him to show "(1) that counsel's performance was deficient, meaning that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced the defense." United States v. Valerio, 676 F.3d 237, 246 (1st Cir. 2012) (quoting Strickland v. Washington, 466 U.S. at 687) (internal punctuation omitted).

The writ easily clears the first hurdle. Indeed, the First Circuit recognized that the advice given to Petitioner "regarding the risk of removal was gross misadvice because it was clearly contrary to law." Castro-Taveras, 841 F.3d at 51 n.15. Although the First Circuit made no factfinding on this point (as it only "assumed without deciding" that Petitioner was given such advice) the Court has no difficulty filling that void here.

The Court has known Petitioner's defense counsel for years as an honest and zealous representative of his clients. On several occasions, including in a face-to-face conference with the Court, Counsel accepted that he gave his client incorrect legal advice before the plea deal. Counsel would not make that statement, and jeopardize so much of his professional reputation, if he did not seriously feel that justice needed to be

done. Counsel's demeanor during the conference, moreover, was consistent with this view. The Court therefore finds that Counsel's statement is an accurate depiction of what actually happened. Petitioner did not receive effective legal assistance before his plea, as guaranteed by the Sixth Amendment.

On the second prong, the question is whether Petitioner suffered "prejudice" stemming from the erroneous advice he received. Although this is the tougher nut to crack, the Court finds this element met as well.

The "right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused" to partake in a just proceeding. United States v. Cronic, 466 U.S. 648, 658 (1984) (deprivation of counsel at trial violates Sixth Amendment); see also Penson v. Ohio, 488 U.S. 75, 88-89 (1988) (same, with respect to an appeal). Typically, a Sixth Amendment claim will involve allegations of "attorney error 'during the course of a legal proceeding' – for example, that counsel failed to raise an objection at trial or to present an argument on appeal." Lee v. U.S., 137 S.Ct. 1958, 1964 (2017) (citing Roe v. Flores-Ortega, 528 U.S. 470, 481 (2000)). In these situations, the Supreme Court has normally applied a "strong presumption of reliability" to the judicial proceeding involved, and has required "a defendant to overcome that presumption by showing how specific errors of counsel undermined the reliability of the finding of guilt." Flores-Ortega, 528 U.S. at 482. Put differently, a defendant must show that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In a narrower subset of cases, within which lies the one at bar, a "much more serious" constitutional issue arises. Flores-Ortega, 528 U.S. at 483. When the claim is that erroneous legal advice led a defendant to forego trial in favor of a plea deal, there is no such presumption of reliability. In the Supreme Court's words, "we cannot accord any presumption of reliability to judicial proceedings that never took place." Flores-Ortega, 528 U.S. at 483. Not only that, but because of the potential gravity of the

Case 3:02-cr-00266-SEC   Document 706   Filed 08/15/17   Page 7 of 14
**Crim. No. 02-266 (SEC)**                                                                 **Page 7**

constitutional violation involved, the presumption shifts in favor of the defendant. Prejudice, under these circumstances, is presumed. Id.

Despite this, recent Supreme Court caselaw still asks whether a defendant was "prejudiced" by erroneous legal advice received prior to a guilty plea. See Lee, 137 S. Ct. at 1965 n.1 ("Contrary to the dissent's assertion, […] we do not depart from Strickland 's requirement of prejudice. The issue is how the required prejudice may be shown."). Nevertheless, a closer reading of these cases reveal that the presumption of prejudice in favor of defendant is not actually disturbed. Perhaps the term "prejudice" is best understood as shorthand for the proposition that, to warrant relief, the defendant must establish a causal link between counsel's deficient performance and the forfeiture of the proceeding involved. Id.; see e.g. Flores-Ortega, 528 U.S. at 484 (reversing Second Circuit's grant of *habeas* relief based "solely upon a showing that counsel had performed deficiently under its standard;" the defendant must also show that he forfeited the right because of that deficient performance). Lee is the most recent case in this arena, and is worth discussing in further detail.

In that case, a lawful permanent resident of the United States was caught selling ecstasy and marihuana to a federal informant. Federal officials raided Lee's home and found drugs, cash and a rifle. Lee admitted that the drugs were his. As a result, a grand jury indicted Lee for possession with intent to distribute a controlled substance.

Worried that a felony conviction would lead to his deportation, Lee retained counsel and began plea negotiations with the prosecution. His attorney put those fears to rest, advising Lee that the plea deal would not carry that consequence. Lee thus accepted the plea and received a comparatively lighter sentence than if he had proceeded to trial. However, as it happened in this case, defense counsel made a mistake: he did not realize that the plea deal involved conduct that qualified as an "aggravated felony" under the immigration laws of the United States, which rendered Lee subject to mandatory deportation. Once he learned of this unwelcome surprise, Lee sought *habeas* relief from the district court, claiming that he would never have pled guilty had he known

the conviction entailed mandatory deportation. At bottom, Lee would have "gambled on trial, risking more jail time for whatever small chance there might be of an acquittal that would let him remain in the United States." See Lee, 137 S.Ct. at 1966.

The district court denied relief, and the Sixth Circuit affirmed. The appeals court reasoned that, since the case against Lee was so strong, he "stood nothing to gain from going to trial but more prison time." Id. Because no rational defendant would choose to go to trial under those circumstances, the Sixth Circuit held that Lee could not show prejudice. Framing the issue as "whether Lee can show he was prejudiced by [his attorney's] erroneous advice," the Supreme Court reversed. Lee, 137 S.Ct. at 1964.

Before the Court, the Government took the position that a defendant cannot show prejudice under Strickland when given erroneous legal advice that leads to the rejection of the plea, if that defendant has no viable defense at trial. In rejecting that proposition, the Supreme Court noted that such bright line rules were not suited to situations that demand a totality-of-the-circumstances analysis of each individual case. More importantly, the Supreme Court reiterated that the analysis must be drawn from the defendant's perspective. That is, to determine whether Petitioner was "prejudiced" under the circumstances present in this type of case, the Court must ask whether there was a "reasonable probability that, but for counsel's errors, [Petitioner] would not have pleaded guilty and would have insisted on going to trial." Lee, 137 S.Ct. at 1965 (citing Hill v. Lockhart, 474 U.S. 52, 59 (1985).

Before pressing on, the Court notes that the defendant in Lee professed an extreme aversion to deportation. For instance, Lee alleged before the district court that
> avoiding deportation was the determinative factor for him; deportation after some time in prison was not meaningfully different from deportation after somewhat less time. He says he accordingly would have rejected any plea leading to deportation—even if it shaved off prison time—in favor of throwing a "Hail Mary" at trial.

Lee, 137 S.Ct. at 1967. It is impossible to determine with absolute certainty whether Petitioner would have rejected any plea deal that would trigger mandatory deportation.

Fortunately, there is no need to pull a rabbit out of this hat, for <u>Lockhart</u> only requires Petitioner to show that there was a "<u>reasonable probability</u>" that he would have rejected a plea deal if he knew it carried that consequence. <u>Lee</u>, 137 S. Ct. at 1965 (citing <u>Hill v. Lockhart</u>, 474 U.S. at 59) (emphasis added). This holds true even if Petitioner's chances of success at trial were slim. <u>Id.</u> at 1967 ("the possibility of even a highly improbable result may be pertinent to the extent it would have affected [the defendant's] decisionmaking"). So, the inquiry is whether there was a reasonable probability that Petitioner, if he knew that the plea deal would make him automatically deportable, would have placed his bets on a trial.

In his writ, Petitioner presents a series of strong arguments in support of that proposition. For starters, Petitioner has not only alleged that his attorney gave him erroneous legal advice (which said attorney has corroborated on more than one occasion), but also that the prosecution led him to believe this advice was accurate. True, the First Circuit affirmed the dismissal of Petitioner's Fifth Amendment claim based on the prosecutor's alleged statements. Still, that result came about because the prosecutor's statements were legally insufficient to sustain such a claim. That is leagues away from the question that is before the Court now, which is whether – from Petitioner's perspective – there is a reasonable probability he would have rejected the plea if he knew that deportation was an inescapable consequence of that plea. For that purpose, Petitioner's sworn statement is admissible evidence. Not only that, but as Petitioner noted in his motion for reconsideration of this Court's initial denial of his writ, <u>see</u> ECF No. 676 at p.2, this statement is unchallenged. To seal the deal, as Petitioner further argues, the Government benefitted from the plea deal, since Petitioner later became the principal witness in the case against the only co-defendant who stood trial.

Obviously, the Government does not bear the burden of providing any legal advice to a criminal defendant. In our adversarial system, as the First Circuit noted, that task belongs exclusively to the defense counsel. All the same, it is eminently reasonable

**Crim. No. 02-266 (SEC)**                                                                                      **Page 10**

to conclude that a defendant who hears consistent legal advice from those who control his fate will likely give great weight to such advice.

On the other hand, Petitioner repeatedly states that if he had known such advice were not accurate, he would not have accepted the deal. In the Court's view, these statements are wholly consistent with the testimony provided by his attorney, which the Court has gauged as highly credible. But Lee urges caution here, as "[c]ourts should not disturb a plea solely because of *post hoc* assertions […] about how he would have pleaded but for his attorney's deficiencies." Id. at 1967 (emphasis added). Instead, it is preferable to "look to contemporaneous evidence [that] substantiate[s] [Petitioner's] expressed preferences." Id.[2] For reasons that are not attributable to Petitioner, that task is difficult, but not impossible, in this case.

In Lee, for instance, the record was fresh and well preserved. This allowed the Supreme Court to ground its holding on, among other things, Lee's expressions in the sentencing phase. Yet time has not been kind to the record in this case. For instance, although Petitioner requested the transcripts of the change of plea and sentencing hearings, neither could be located despite reasonable efforts by the courtroom reporter. See ECF No. 674. The Government, for its part, acknowledges that a new trial in this case would be nearly impossible to prosecute. See ECF No. 651, p. 5 ("Parts of the records are missing, transcripts unavailable, witnesses most likely unavailable, and the lapse of eleven (11) years cannot but provide great difficulty."); see also ECF No. 697 at p. 6 n.6 (noting that various motions in the earlier portion of the docket are also unavailable).

To make a long story short, the only surviving evidence that is contemporaneous to the plea is contained within the Government's latest filing. See ECF No. 697. The first is the transcript of Petitioner's testimony in the case against his co-defendant. ECF

---

[2] This explains why the Court has chosen to proceed without a full-blown evidentiary hearing. In the Court's view, a hearing at this junction would shed little, if any, light on the evidence that was contemporaneous to the plea deal. Moreover, the Court was able to hear Petitioner's counsel at the status conference, and the Court found him credible. This, combined with the available evidence, is sufficient to sustain the Court's decision here.

No. 697-1. The second is the presentence report submitted by the probation officer prior to Petitioner's sentencing. ECF No. 697-2. The final document is an addendum to that presentence report. ECF No. 697-3. None of these documents, however, were included in the Government's original opposition to the writ.

On appeal, the Government asked the First Circuit "to consider the transcript that it discovered in its file cabinet allegedly to the detriment of Castro, and to do so in order to affirm the district court's denial of Castro's *coram nobis* petition." Castro-Taveras, 841 F.3d at 40 n.4. The First Circuit rebuffed the Government's request by noting that – at the very least – Petitioner should be given a chance to contest the contents of the transcript here. Id. On the other hand, the Government did not submit the presentence report and its addendum before the First Circuit at all. Although the Government did so in compliance with this Court's post-appeal order, on reflection, the Court is hard-pressed to see why it should not consider any argument based on these documents as waived. In any event, even if they were properly preserved, these documents lend support to the notion that Petitioner would have chosen trial if he knew the plea deal would render him deportable.

The Government suggests, for instance, that the cross-examination of Petitioner reveals that he knew (or should have known) that he became deportable after his plea of guilty. Yet as the First Circuit underscored, the "cited testimony is not so explicit that it alone could conclusively establish that Castro knew of the removal risk of his conviction at the time he entered the plea." Castro-Taveras, 841 F.3d at 40 n.5. In the Court's view, the transcript does little to advance this proposition – especially given its context. Even if Petitioner knew the plea deal would leave him at risk of deportation, this does not mean he knew deportation would be the only outcome of such proceedings. Put differently, there is nothing to suggest that Petitioner knew his conviction would trigger mandatory deportation. Indeed, the same observation allows the dispatch of the argument based on the presentence report. Through that report, the probation officer informed the Court that Petitioner would face deportation proceedings due to the nature

of the offense. But the officer never said that Petitioner was automatically deportable. And that sliver makes all the difference. As the Supreme Court noted in Lee, but for his attorney's advice, "Lee would have known that accepting the plea agreement would *certainly* lead to deportation. Going to trial? *Almost* certainly." See Lee, 137 S.Ct. at 1969.[3]

So, the question remains: do these documents show there existed a reasonable probability that Petitioner would have chosen trial *vis a vis* the plea deal, if he knew that the plea deal entailed mandatory deportation? Yes. Perhaps the best evidence of this is that, by the time he pled guilty, Petitioner had already formed strong ties to the United States. In 1995, he became a permanent resident of the United States. He held a stable job (both before and after the indictment), married his then-wife, and had other family members living in the United States.

At the same time, the record does nothing to chip away at Petitioner's theory. On the balance, given the state of the record and the unusual circumstances of this case, the Court finds that Petitioner has adequately demonstrated prejudice under Strickland. In other words, there is a "reasonable probability" that Petitioner would have chosen to go to trial if he knew that pleading guilty would require his deportation.

The Court has thus found all of the Strickland criteria met. Petitioner did not receive effective assistance of counsel as guaranteed by the Sixth Amendment, and suffered prejudice as a result. But the analysis is not done. To put the finishing touches, the Court must loop back to the standard of *coram nobis* and determine whether Petitioner has demonstrated that, in his particular case, that "justice demands the extraordinary balm of coram nobis relief." Castro-Taveras, 841 F.3d at 39. This case neatly fits within that mold.

---

[3] The presentence documents also serve to highlight why the state of the record is particularly problematic in this case. Why should the Court consider these documents in a vacuum, particularly this discussion about the issue of deportability, without the benefit of what was later said at the sentencing hearing? It strikes the Court as fundamentally unfair to distill an incomplete conclusion from the ragged edges of the record in this case in order to deny Petitioner relief.

On this point, the Court defers to the Government's earlier brief, which neatly summarizes the many equities in favor of relief:

> Before the Court is, by all appearances, a man who through time has changed his criminal ways. He did the time required for him to pay back to society the wrongs he did. Before doing the time, he paid back society by cooperating with the government in seeking further justice for the victims in this case. He paid financial restitutions as well as moral restitutions. He's worked diligently, legally earning monies that once he obtained by other means. He's paid his taxes and child support as required by law and by all moral compasses. Makes sure to pay his debts timely. He's fathered three children, all American citizens; one having been born after he completed his punishment. When he goes into attempting to complete, what we all call the American Dream, he is told that he cannot become naturalized, but that instead, he must abandon the country he has known as home and the children that depend on him.

See ECF No. 651. In the years since these able words graced the page, Petitioner has only reinforced the equities described above. See ECF No. 627 (submitting a wealth of letters and documents in support). Before the Court, then, stands a reformed man who deserves a blank slate and an opportunity to press forward with his life. And at the core of the Court's calculus lie Petitioner's children, all of whom are American citizens. To deport Petitioner now –almost two decades after the criminal justice system was done with him– would devastate these children. That, in the end, would be the greatest tragedy of all.[4]

---

[4] In George, the First Circuit curiously stated that courts retain "discretion over the ultimate decision to grant or deny the writ," even "if the test is satisfied." George, 676 F.3d at 254 (emphasis added). The words "to grant" are probably an oversight, given George's later statement that "[a]dditional circumstances, not readily susceptible to facile categorization, may provide adequate reason for a court, in the exercise of its discretion, to stay its hand." Id. at 255 (emphasis added). Indeed, in Castro-Taveras, the First Circuit shied away from this choice of words, stating that the Court retains discretion to deny coram nobis relief, but never saying it has discretion to grant it. See also Williams v. United States, 858 F.3d 708, 715 (2017) (same). In the unlikely event that the inverse is true (i.e., that discretion is still available to grant the writ whenever justice would require "the extraordinary balm of coram nobis relief" even if the preconditions are not fully met) then the Court would not hesitate to exercise such discretion if it were necessary to support the decision in this case. As discussed above, the equities of this case tilt the scales of justice decidedly in Petitioner's favor.

### IV.     Conclusion

Petitioner has amply demonstrated that his case warrants the "extraordinary balm" of *coram nobis* relief. For all of these reasons, Petitioner's writ of *coram nobis* is **GRANTED**, and his conviction is **VACATED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 15th day of August, 2017.

*s/ Salvador E. Casellas*
SALVADOR E. CASELLAS
U.S. Senior District Judge